The Honorable J. Kelly Arnold

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA

RICKEY PERALEZ, on behalf of himself and
others similarly situated,

               Plaintiff,

    v.

THE WASHINGTON DEPARTMENT OF
CORRECTIONS, HAROLD CLARKE,
DOUGLAS WADDINGTON, BELINDA
STEWART, KEVIN SHANAHAN, JEAN
STEWART, and JOHN DOES 1-20,
employees and officials of the Washington
Department of Corrections and/or Stafford
Creek Corrections Center,

               Defendants.

NO.  C06-5625 JKA

DECLARATION OF EDWIN S. BUDGE

FILED IN CONNECTION WITH:

- Plaintiff's Motion for Partial Summary Judgment; and

- Plaintiff's Motion to Determine Sufficiency of Defendants' Responses to Plaintiff's Requests for Admission

I, Edwin S. Budge, declare and state as follows:

1.    I am one of the attorneys representing the certified class in the above-captioned case. I have personal knowledge of the matters contained in this declaration and am competent to testify to them.  This declaration is submitted in connection with Plaintiff's Motion for Partial Summary

DECLARATION OF EDWIN S. BUDGE - 1

BUDGE & HEIPT, P.L.L.C.
705 SECOND AVENUE, SUITE 910
SEATTLE, WASHINGTON 98104
(206) 624-3060
(206) 621-7323 (fax)

1   Judgment and Plaintiff's Motion to Determine Sufficiency of Defendants' Responses to Requests for

2   Admission.

3       2.      This case was certified as a class action on August 10, 2007.  In the months before and

4

5   after the class was certified, our office conducted discovery in order to learn more about the work

6   release referral methods of the Department of Corrections ("DOC") as well as finding out how the

7   DOC classifies and treats offenders with physical, sensory and/or mental health needs.  Among other

8   things, we issued requests for production of documents, interrogatories, and requests for admission.  I

9   deposed current and former heads of DOC work release facilities, as well as the DOC's Chief of

10  Classification, Jean Stewart.  The DOC produced work release denial forms and legal face sheets for

11  thousands of former inmates (after an order compelling production) as well as policies and directives

12

13  and other materials.

14      3.      Attached hereto as Exhibit 1 are true and correct copies of excerpts from the

15

16  Deposition of Xandis Phillips cited in the accompanying Motion for Partial Summary Judgment.

17      4.      Attached hereto as Exhibit 2 are true and correct copies of excerpts from the

18  Deposition of Sandra Musselwhite cited in the accompanying Motion for Partial Summary Judgment.

19      5.      Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff's October 16, 2007

20

21  Requests for Admission to Defendants and Responses Thereto.

22      6.      Attached hereto as Exhibit 4 are true and correct copies of excerpts from the

23  Deposition of Jean Stewart, the DOC's Chief of Classification, cited in the accompanying Motion for

24  Partial Summary Judgment.

25      7.      Attached hereto as Exhibit 5 is a true and correct copy of the DOC's response to

26

27  Interrogatory No. 11 of Plaintiff's October 16, 2007 Interrogatories.

28

DECLARATION OF EDWIN S. BUDGE - 2

BUDGE & HEIPT, P.L.L.C.
705 SECOND AVENUE, SUITE 910
SEATTLE, WASHINGTON 98104
(206) 624-3060
(206) 621-7323 (fax)

8.      Attached hereto as Exhibit 6 are true and correct copies of excerpts from the Deposition of Kristine Skipworth cited in the accompanying Motion for Partial Summary Judgment.

9.      In order to understand the DOC's practices, our office sought copies of all work release denial forms from October 30, 2003.  After a motion to compel was granted, the DOC produced the forms.  The DOC produced well over 2000 work release denial forms for the period of October, 2003 to August, 2007.  In addition, the DOC was required to produce documents called "legal face sheets," which are computer printouts showing the offender's PULHESDXT scores and history with the DOC.  The legal face sheets summarize any rulings on work release transfer requests.  Our office reviewed and categorized these materials.   The accompanying Motion for Partial Summary Judgment (at Section III.C.2.a.) identifies fifteen examples of work release denial forms where offenders were rejected because of their PULHESDXT scores.  True and correct copies of these fifteen work release denial forms are attached hereto as Exhibits 7-21.  The offenders are referred to by their initials in the accompanying Motion for Partial Summary Judgment, and their names and DOC numbers have been redacted for purposes of this filing.  As discussed in the accompanying Motion for Partial Summary Judgment, the foregoing are intended to be examples only.  Our review of the work release denial forms revealed numerous other occasions where the forms indicated that work release was denied because of the offender's PULHESDXT score.

10.      True and correct copies of legal face sheets for each of the fifteen offenders mentioned above are attached hereto as Exhibits 22-36.  As with the work release denial forms, the names and DOC numbers have been redacted for purposes of this filing.

11.      In the course of reviewing work release denial forms, we noticed that work release denial forms sometimes referenced a code called "DT-25" when denying offenders based on their

DECLARATION OF EDWIN S. BUDGE - 3

BUDGE & HEIPT, P.L.L.C.
705 SECOND AVENUE, SUITE 910
SEATTLE, WASHINGTON 98104
(206) 624-3060
(206) 621-7323 (fax)

1  PULHESDXT scores (*see, e.g.,* Exs. 18 and 19 attached hereto).  This code did not appear to be part

2  of any publicly-available DOC policy directive.

3      I declare under penalty of perjury, under the laws of the United States that the foregoing is

4  true and correct.

5  

6      DATED this 19 day of __November__ 2007 at Seattle, Washington.

7  

8                      _____

9                      Edwin S. Budge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF EDWIN S. BUDGE - 4

**BUDGE & HEIPT, P.L.L.C.**
705 SECOND AVENUE, SUITE 910
SEATTLE, WASHINGTON 98104
(206) 624-3060
(206) 621-7323 (fax)

4

# DECLARATION OF EDWIN S. BUDGE

# EXHIBIT 1

Case 3:06-cv-05625-JKA   Document 43   Filed 11/29/07   Page 6 of 68

Peralez vs. The Washington Department of Corrections     Xandis Phillips                    November 8, 2007

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA

RICKEY PERALEZ, on behalf of      )
himself and others similarly      )
situated,                         )
                                  )
                Plaintiff,        )
                                  )
     vs.                          )  No. C06-5625 JKA
                                  )
THE WASHINGTON DEPARTMENT OF      )
CORRECTIONS, HAROLD CLARKE,       )
DOUGLAS WADDINGTON, BELINDA       )
STEWART, KEVIN SHANAHAN, JEAN     )
STEWART, and JANE DOES 1-20,      )
employees and officials of the    )
Washington Department of          )
Corrections and/or Stafford Creek )
Corrections Center,               )
                                  )
                Defendants.       )

Deposition Upon Oral Examination

of

XANDIS PHILLIPS

Taken at 800 Fifth Street
Seattle, Washington

DATE:  November 8, 2007

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

STARKOVICH REPORTING SERVICES
(206)323-0919

Page 5

1              SEATTLE, WASHINGTON; THURSDAY, NOVEMBER 8, 2007

2                           10:05 A.M.

3                            --o0o--

4

5    XANDIS PHILLIPS,                 deponent herein, having been

6                                     first duly sworn on oath, was

7                                     examined and testified as

8                                     follows:

9

10                   E X A M I N A T I O N

11   BY MR. BUDGE:

12        Q.    State your name, please.

13        A.    Xandis Phillips.

14        Q.    What is your title, Ms. Phillips?

15        A.    Muni corrections supervisor.

16        Q.    Where do you work?

17        A.    Reynolds Work Release.

18        Q.    What is your business address, please?

19        A.    410 Fourth Avenue, Seattle 98104.

20        Q.    And you physically work at Reynolds Work Release

21   down at -- near the courthouse?

22        A.    I do.

23        Q.    And you understand that you have an obligation to

24   answer the questions today truthfully and completely?

25        A.    I do.

Peralez vs. The Washington Department of Corrections    Xandis Phillips                November 8, 2007

Page 6

1    Q.   And if you don't understand a question that I ask,

2    ask me to clarify, and I will.  Okay?

3    A.   We'll do.

4    Q.   Could you give me an overview of your employment

5    history with the department of corrections?

6    A.   I started working for the department in 1975 -- I

7    wish I could remember where -- at Everett Work Release.  I

8    worked there till the late '70s, went work for Burien DOC as

9    a probation parole officer, stayed there -- I'm going to

10   estimate, because I can't remember exactly --

11   Q.   Sure.

12   A.   -- probably a year to two years, went to Bishop --

13   or went to Bellevue -- excuse me -- my mistake -- Bellevue

14   DOC field office, stayed there for a year, and then went to

15   Bishop Lewis Work Release, worked there ten years as a CCO.

16        If I'm going too fast, let me know.  I'm trying to

17   remember where I went from there.

18        I went to Reynolds Work Release as a CCO for

19   approximately six months, and then I became a hearings

20   officer, did that for about four and a half years.  Then I

21   was promoted to supervisor of Bishop Lewis Work Release

22   special needs unit, and I only did that for about

23   approximately six months, and they rotated me to Reynolds

24   Work Release.  And then I had Reynolds Work Release and

25   special needs unit for approximately three years, and then I

STARKOVICH REPORTING SERVICES
206.323.0919

8                                                         d80c0500-e0b1-45e9-946a-c092a55c6fd3

Peralez vs. The Washington Department of Corrections     Xandis Phillips                    November 8, 2007

Page 7

1   just had Reynolds Work Release for the last, probably, seven

2   years.

3       Q.   Okay.  Has your position in the last seven years

4   at Reynolds Work Release changed in any significant way, or

5   is it basically the same?

6       A.   Basically the same.

7       Q.   So for the last seven years, you've been a

8   community corrections officer at Reynolds?

9       A.   Community corrections supervisor.

10      Q.   Supervisor.  Okay.

11      A.   And actually, I've been there for 11 years.  I

12  had -- when I said that I was at Reynolds Work Release with

13  the special needs unit, I supervised two units at that

14  point, but I was still supervising Reynolds.  Does that make

15  sense?

16      Q.   As much sense as I need to have it make.  In other

17  words, you've been at Reynolds for the past 11 years in a

18  row.

19           We have to go one at a time so she can write it

20  down.

21           So you've been at Reynolds for the last 11 years

22  in a row?

23      A.   Yes.

24      Q.   And for the last seven of those 11 years, your

25  title has been what?

Peralez vs. The Washington Department of Corrections    Xandis Phillips                    November 8, 2007

Page 8

1          A.    Community corrections supervisor.

2          Q.    Okay.  Could you please explain to me what,

3    generally speaking, your duties and responsibilities are as

4    a community corrections supervisor at Reynolds?

5          A.    I supervise the CCOs, which I have, at this point,

6    four, the support staff, which I have two, plant manager,

7    ensure that they are dealing with the residents of work

8    release appropriately, doing case management with them,

9    getting plans out for release, just oversight of the

10   building and the facility.

11         Q.    In terms of the hierarchy at Reynolds Work

12   Release, are you at the top of the hierarchy?

13         A.    Yes.

14         Q.    How many offenders, roughly, are there at

15   Reynolds?

16         A.    100.  Capacity of 100.  Right now we have 50,

17   because we're doing renovations.

18         Q.    Okay.  But generally speaking, there's somewhere

19   around 100?

20         A.    Yes.

21         Q.    And how many total staff, approximately?

22         A.    My staff, I have seven.

23         Q.    Over the last seven years, what duties and

24   responsibilities have you had when it comes to reviewing and

25   ruling on work release transfer requests?  Do you know what

Page 9

1    I mean by that?

2         A.   No.

3         Q.   Have you had a say in deciding whether work

4    release transfer requests, that is, whether offenders'

5    requests to come to Reynolds, will be granted or denied?

6         A.   Yes.

7         Q.   Tell me what your job has been in that regard.

8         A.   I -- okay.  There's three work release supervisors

9    in King County.  We have a big screening list.  I assign

10   them out for screening to all of us equally, and then

11   whatever cases I've been assigned I will review and screen.

12        Q.   Okay.  We'll go back to that in a little while.

13             What happens at Reynolds Work Release if -- well,

14   first of all, the people who live at Reynolds Work

15   Release -- what do you call them?

16        A.   Residents.

17        Q.   Okay.  What happens if a resident at Reynolds

18   needs to see the doctor?

19        A.   I'm sorry.  One more time.

20        Q.   What happens if a work release resident needs to

21   see a doctor?

22        A.   They request it through their community

23   corrections officer, and they're granted a pass to go to the

24   doctor, hospital, whatever they need to do.

25        Q.   And are there any set rules about who pays for it?

Page 10

1      A.   Yes.   Policy dictates they are required to pay for

2   their own medical.

3      Q.   And what do they have to do in order to prove that

4   they need to see a doctor, if anything?

5      A.   We have them call the on-call nurse at Harborview,

6   because we have a contract with Harborview, and they tell

7   her the symptoms.   She makes the decision whether or not

8   they need to be seen medically or if it can wait till the

9   next day.

10     Q.   Well, regardless of whether the nurse says they

11  need to go immediately or whether they need to be seen the

12  next day, does Reynolds have any problem, generally

13  speaking, with granting passes to those --

14     A.   Never.

15               THE COURT REPORTER:   One at a time, please.

16     Q.   Let me just ask the question again, and we'll get

17  it clarified, and then we'll go on, and I'll try to do

18  better about --

19     A.   And I will try to do better about not answering

20  before the question is finished.

21     Q.   So generally speaking, does Reynolds have a

22  problem with giving residents passes to go see the doctor?

23     A.   No.

24     Q.   Are there some residents at Reynolds who have a

25  need for regular medical appointments?

Page 11

1      A.    Yes.

2      Q.    And what happens when a resident has a need for a

3  regular medical appointment?

4      A.    We put it on what's called an offender's schedule

5  plan, and then it's recurring.  So we'll just put on there

6  what day of the week and what time they go every week, and

7  they're just allowed to go out and do that.

8      Q.    And are there some residents who go as frequently

9  as every week?

10     A.    I can't tell you that for sure.  I don't supervise

11 the residents.

12     Q.    Okay.  But there are those residents who have a

13 need for regular medical appointments?

14     A.    There are.

15     Q.    And Reynolds Work Release has a process set up by

16 which those people can go to their regular medical

17 appointments?

18     A.    Yes.

19     Q.    How do the residents get up to the doctor?

20     A.    They either walk, CCOs will take them, or we call

21 911.  Depends on the circumstance.

22     Q.    Can they take the bus?

23     A.    Yes.

24     Q.    And when you say CCOs will take them, a CCO,

25 again, is --

Page 12

1     A.   Community corrections officer.

2     Q.   Okay.  So they're set up to actually transport

3  residents to doctors' appointments when necessary?

4     A.   Correct.

5     Q.   All right.  Do doctors or nurses ever come to

6  visit the work release facility?

7     A.   They have.

8     Q.   What kinds of medical issues come up with

9  residents at work release?

10    A.   I'm worried about answering that, because it's

11  confidential information.

12    Q.   Sure.  I understand.  Without naming any

13  particular resident, I'm just looking for sort of a broad

14  description of the kinds of issues that might come up.

15           MR. JOBSON:  Yeah.  You may answer in general

16  terms without identifying an inmate or giving enough

17  information that would allow someone to identify a

18  particular inmate.

19    A.   STDs, TB tests, HIV protocols, general hurt

20  themselves at work, might have to go get checked out for

21  L & I, general, you know -- what do I want to say? --

22  physical, things like that.  I'm having a brain lock on what

23  to say.

24    Q.   That's okay.  It's a funny question.  Has there,

25  over the course of the last seven years, been a broad range

Page 13

1    of medical issues that come up?

2         A.    Yes.

3         Q.    And Reynolds tries to do what it can to allow

4    those inmates who have medical needs to get medical

5    treatment?

6         A.    Yes.

7         Q.    Are there some residents who are on prescription

8    medications?

9         A.    Yes.

10        Q.    What is the process at Reynolds to deal with those

11   residents who have a need for prescription meds?

12        A.    The protocol is they must bring them into the

13   facility after they've been prescribed by a doctor and

14   filled by a pharmacy.  They're turned over to the front desk

15   staff for logging in on what it is, when they're due to take

16   it.  If it is a narcotic, Class A, it is dispensed or held

17   by the contract staff, and then they allow the guys to take

18   it.  The guys have to come down to get the pills to take it.

19   If it is a regular heart medication, allergy medication,

20   something of that sort that's in our DOC formula, the guys

21   keep them in their room and give them to themselves.

22        Q.    So they can self-administer it?

23        A.    Yes.

24        Q.    And has that basically been the way it's been over

25   at least the past seven years or so when it comes to meds,

Peralez vs. The Washington Department of Corrections    Xandis Phillips

November 8, 2007

Page 14

1    that some meds are dispensed by staff at Reynolds and other

2    meds are permitted to be self-administered by the residents?

3        A.   No.   It changed, and I'm going to give you a

4    guess, approximately a year and a half to two years ago,

5    where the offenders or residents could keep their meds and

6    self-administer in their rooms.   Prior to that, everything

7    was logged and kept back in the back, and then they had to

8    come down to get it.   But since the prisons do it now, we're

9    allowed to let them self-administer their own medication.

10       Q.   Okay.   And prior to a year and a half ago, when it

11   was changed, if an inmate had a need, for example, for a

12   regular medication, let's say high blood pressure or

13   diabetes or a heart condition or something like that, that

14   required, you know, this regular regime of treatment, the

15   Reynolds Work Release was set up to dispense that med on a

16   regular basis?

17       A.   Correct.

18       Q.   Okay.   Have you worked in the prison setting

19   before?

20       A.   No.

21       Q.   What are the rules when it comes to visitation by

22   family members?

23       A.   We go by policy, number one.   Number two, when a

24   resident arrives, they're allowed a half-an-hour visit with

25   family.   They fill out all their sponsor papers, and they're

Peralez vs. The Washington Department of Corrections    Xandis Phillips

November 8, 2007

Page 15

1    allowed to visit their family member, and then we have to

2    send if off for a records check, which takes between a week

3    and two weeks.  Once that is back to us, it's reviewed, and

4    the CCO either approves or denies, depending on what comes

5    back in the records check.

6        Q.   And assuming that the visitor is cleared by the

7    records check, what are the rules about when they can come

8    and see residents?

9        A.   As soon as it is approved, they're allowed to come

10   visit.

11       Q.   As frequently as they wish?

12       A.   Uh-huh.

13       Q.   Yes?

14       A.   Yes.

15       Q.   And can they stay as long as they want?

16       A.   No.  Visiting hours are 10:30 a.m. to 10:30 p.m.

17   daily.

18       Q.   But during those 12 hours of visiting hours, can

19   they stay for more than an hour or two at a time?

20       A.   Yes.

21       Q.   Do visitors ever assist residents with medical

22   issues?

23       A.   I don't understand what you mean.

24       Q.   Well, for example, if an inmate, or rather a

25   resident, needs to see the doctor, can the visitor assist

Peralez vs. The Washington Department of Corrections    Xandis Phillips

November 8, 2007

Page 16

1    the resident with transportation to the doctor?

2        A.   Depends on the situation.  Depends on the CCO.

3    Depends on -- the CCO has to approve it.

4        Q.   And does the CCO ever approve visitors to assist

5    with transportation of residents to go to the doctor?

6        A.   Specifically, I would -- can't tell you

7    specifically.  But generally, in my facility, yes.

8        Q.   All right.  And what if a resident needs to talk

9    with a medical provider on the telephone?  Is Reynolds set

10   up to allow a resident to talk to a medical provider on the

11   phone?

12       A.   Yes.

13       Q.   Let's suppose a resident has a need for some other

14   sort of regular medical procedure besides just taking

15   medication that can be dealt with in an outpatient setting.

16   For example, let's suppose they have a dressing that needs

17   to be changed on a regular basis.  How is that dealt with at

18   Reynolds?

19       A.   Again, on an offender plan, and we put down if

20   they have to go daily, or whatever, they have to come back

21   to the facility from work or wherever they're coming from,

22   check into the facility, and then they're allowed to check

23   out to go to Harborview to get a dressing changed.

24       Q.   And can they also have materials in their

25   possession at Reynolds that would allow them to do a

Peralez vs. The Washington Department of Corrections     Xandis Phillips

November 8, 2007

Page 17

1    dressing change, if that could be done?

2        A.    Yes.

3        Q.    What about physical therapy?  Are there ever any

4    residents who have a need for physical therapy?

5        A.    Yes.

6        Q.    How is that dealt with?

7        A.    Same way.  Offender plan.  We get the schedule,

8    verify what their schedule is.  They're either on the bus,

9    if they can -- however they can get there that's, you know,

10   good for them, and then they're allowed to go to physical

11   therapy.

12       Q.    Okay.  Are there a lot of medical facilities

13   around Reynolds, hospitals and doctors, that sort of thing?

14       A.    Yes.

15       Q.    Do employers of residents sometimes provide health

16   insurance?

17       A.    Yes.

18       Q.    Okay.  What programs and services does Reynolds

19   offer to residents when it comes to finding employment?

20       A.    Oh, boy.  Our CCOs go out and help them.  Our CCOs

21   will take them out to look for work.  We have --

22       Q.    Sorry.  If I can interrupt here for one second.

23   They'll actually, physically, take them out in a vehicle?

24       A.    Yes, they will.  We have a job developer through

25   the contractor, Pioneer Human Services, who comes in every

Peralez vs. The Washington Department of Corrections     Xandis Phillips                    November 8, 2007

Page 18

1    Friday, and a lot of times guys get their own jobs.

2         Q.    Is the job developer a job counselor?  Is that the

3    correct way of characterizing it?

4         A.    You know, I don't know.  She doesn't work for me.

5    She works for the contractor.  So I'm not exactly sure.  I

6    know that she comes into the facility, looks and helps guys

7    with resumes, and guides them to jobs.  That's all I can

8    tell you.

9         Q.    Okay.  So there is somebody called a job developer

10   who comes into the facility on a regular basis --

11        A.    Every Friday afternoon.

12        Q.    -- and assists inmates with completing resumes and

13   job applications?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.

17        Q.    And the job developer also provides advice about,

18   you know, places that might be suitable for the resident to

19   target for employment?

20        A.    Correct.

21        Q.    Let's suppose that I was a person who had just

22   been transferred to Reynolds Work Release, and I arrive at

23   the facility, and I am interested in getting a job.  What is

24   the general process of how inmates go about -- or residents

25   go about finding a job?

20

d80c0500-e0b1-45e9-946a-c092a55c6fd3

Peralez vs. The Washington Department of Corrections     Xandis Phillips                    November 8, 2007

Page 19

1          A.    When they come into the facility, they have an

2     initial interview with their CCOs, and the CCOs talk about

3     how they had previous employment, what kind of jobs are they

4     going to look for, and kind of get a feel for, you know, job

5     experience.  A lot of times people have never held a job.

6               Then they go through an initial classification

7     where the whole staff talk to them, give them ideas about

8     where to look for work, things like that.  And then three to

9     four days after they're there, they start going out to look

10    for work.

11         Q.    And they're allowed to leave the facility on their

12    own?

13         A.    They are.

14         Q.    And go out for the day?

15         A.    They go from 7:30 to 11:30, back in for an hour,

16    and then out again 12:30 to 4:30.

17         Q.    And they can literally take the bus, if they

18    desire, down to South Seattle, and walk the street putting

19    in applications?

20         A.    No.  They have to go out with what's called an

21    employment seeking pass, which is preapproved by the CCO,

22    and they have to put down the three places that they're

23    going to go.  So they have to do a little bit of

24    preplanning.  And then we try to, you know, guide them.

25    Sometimes they'll have one in North Seattle and one in South

Peralez vs. The Washington Department of Corrections     Xandis Phillips                    November 8, 2007

Page 20

1    Seattle, and we're, like, You can't make that in one time,

2    you know, Try to get them all in the same area.  And we tell

3    them that if they see a place that's hiring on the way, they

4    can add that onto the job search pass if they stopped in

5    there.

6         Q.   So if they see a sign that says "Applications

7    welcome" --

8         A.   Right.

9         Q.   -- they can stop?

10        A.   Yes.

11        Q.   All right.  And does Reynolds Work Release provide

12   reference services in the way of, you know, classified ads

13   in the newspaper or Internet access or something like that

14   so that residents can look to see who might be hiring?

15        A.   We do.  We have a newspaper that comes in daily.

16   We also have a job board where we post when we find out that

17   people are hiring.  And then we also have Gloria Baker, who

18   comes in with people who are hiring.

19        Q.   Is she the job developer?

20        A.   She is the job developer, yes.

21        Q.   So she will actually come in with specific

22   information about which employers are looking to hire

23   residents?

24        A.   She could.

25        Q.   Sometimes she does?

Page 21

1        A.   Sometimes she has, yes.

2        Q.   Okay.  So are there some employers that are known

3    at Reynolds to specifically hire work release residents on a

4    regular basis?

5        A.   Yes.

6        Q.   Can you name some of them for me?

7        A.   Albert Lee Appliances.

8             Is it okay to do that?

9                 MR. JOBSON:  Uh-huh.

10       A.   I just don't want to give away all my job

11   resources.  Albert Lee Appliances, Ralph's Concrete, the

12   unions, Jiffy Lube.  I can't think of any more, off the top

13   of my head.

14       Q.   That's okay.  What advantages are there, if you

15   know, from the perspective of these employers, to hiring

16   work release residents?

17       A.   I can't answer that.

18       Q.   Okay.  Do the work release residents receive any

19   sort of financial assistance in connection with their job

20   search?

21                 MR. JOBSON:  Do you mean money?

22                 MR. BUDGE:  Yeah.

23       A.   When they first arrive at the facility, they

24   are -- some are, I should say, not all -- some are provided

25   a draw check so they can get a bus pass so they can get on a

Peralez vs. The Washington Department of Corrections    Xandis Phillips

November 8, 2007

Page 22

1   bus and work search.  Depends on their situation.  Depends

2   on how in debt they are.  Depends on a whole lot of issues.

3        Q.   Okay.  So let's assume a resident comes in, and he

4   or she has no or very little money in his or her trust

5   account.  Reynolds will provide some residents in that

6   situation with essentially an advance?

7        A.   A loan.

8        Q.   A loan?

9        A.   We call it a loan, right.

10       Q.   Okay.  And they can use that money to what?

11       A.   Buy bus passes, hygiene items, whatever they may

12  need to survive, or buy clothes to look for work.  Just

13  depends on the guy.

14       Q.   How much money does Reynolds loan to the

15  residents?

16       A.   It's not Reynolds.  It's called The Emit [ph]

17  Banking System.  So you know, I don't know.  It's the CCO's

18  job to do that.  I honestly can't tell you how much.

19       Q.   All right.  And then is the process that the money

20  will be paid back by the resident out of his or her future

21  earnings?

22       A.   Correct.

23       Q.   And the residents can then literally, with that

24  draw check, go shopping, I mean, go shopping to buy clothes,

25  go shopping --

Page 23

1        A.    If they need to.

2        Q.    -- go shopping to buy, you know, as you say,

3    hygiene items, toiletries, that sort of thing?

4        A.    With the CCO approval.

5        Q.    But they can do it once they get the CCO approval

6    to stop at the store?

7        A.    Yes.

8        Q.    They can do it on their own?

9        A.    Yes.

10       Q.    All right.

11       A.    My apologies.

12       Q.    That's okay.  You're doing great.  Let's assume

13   that an offender is successful in finding employment.  What

14   happens to the paychecks that the resident receives from the

15   employers?

16       A.    There's two ways.  Some of the employers mail

17   their paychecks in to the facility.

18       Q.    So they will actually mail it to the resident,

19   care of Reynolds Work Release?

20       A.    Uh-huh.

21       Q.    Yes?

22       A.    Or the offender is allowed to bring it in.

23       Q.    To physically bring in the paycheck?

24       A.    Physically bring in the paycheck.  They are

25   required to turn it over to the front desk with a signature,

Page 24

1   and they're given a receipt.  It's logged in, and then it's

2   sent to their inmate banking account.

3       Q.   Which is a trust account?

4       A.   Trust account.

5       Q.   And then when they are eventually released from

6   Reynolds, are they provided with a check for their

7   accumulated earnings?

8       A.   Yes.

9       Q.   And are the deductions automatic out of that trust

10  account?

11      A.   Yes.

12              MR. JOBSON:  Can we go off the record for a

13  second?

14              MR. BUDGE:  Yes.

15                       (Discussion off the record.)

16      Q.   Does Reynolds keep any sort of records or

17  statistics that would indicate the percentage of inmates who

18  are successful finding employment?

19      A.   No.

20      Q.   Do you have any way to tell me, off the top of

21  your head, a rough estimate of the percentage of inmates who

22  are successful in finding employment?

23      A.   No.

24      Q.   Would you say it's more than 50 percent?

25      A.   I would guess that.  I can't honestly tell you for

Page 25

1    sure.

2        Q.   Okay.   Is it a requirement that residents at

3    Reynolds seek employment?

4        A.   Yes.

5        Q.   Are there any exceptions?

6        A.   Yes.

7        Q.   What are the exceptions?

8        A.   Exceptions could be if an offender is or resident

9    is going to another county.   Like we serve King, "Sno," and

10   Island County only.   So if we have somebody there, an

11   exception that may be going to another county, we usually

12   don't have them work, because -- depending on their time

13   there, because they will only work for an employer for, you

14   know, a month and then burn out our employer.   So we usually

15   have them work in the house.

16       Q.   Oh, so they can actually work at the Reynolds

17   facility.

18       A.   Uh-huh.

19       Q.   Yes?

20       A.   Yes.

21       Q.   And do they get paid for that?

22       A.   Some do -- they have to apply for a job -- and

23   some don't.   Sometimes we just have them work in the

24   facility, doing community service, if they can't work.

25       Q.   But there are some residents who can actually work

Peralez vs. The Washington Department of Corrections    Xandis Phillips                   November 8, 2007

Page 26

1     for at least minimum wage at Reynolds Work Release?

2          A.    Correct.

3          Q.    How many, approximately, residents are employed at

4     Reynolds Work Release at any one time?

5          A.    Usually two.

6          Q.    Do you know how much Reynolds pays?

7          A.    No.

8          Q.    But it's at least minimum wage?

9          A.    Yes.

10         Q.    What programs or services are offered in the way

11    of chemical dependency, counseling, alcohol counseling,

12    things like that?

13         A.    We have two chemical dependency counselors on

14    site, we have intensive outpatient treatment, and then we

15    have continuing care, which is like an outpatient.  We have

16    an on-site AA/NA meeting.

17         Q.    "AA" meaning "Alcoholics Anonymous" and "NA"

18    meaning "Narcotics Anonymous"?

19         A.    Correct.  We have stress anger management.  We

20    have a class called Getting It Right, which is about

21    critical thinking skills, but every year there's different

22    programming.  So I'm telling you what we have now.

23         Q.    And you've had similar, if not identical, programs

24    over the years?

25         A.    Correct.

Peralez vs. The Washington Department of Corrections    Xandis Phillips                    November 8, 2007

Page 27

1        Q.    Let's assume that a resident gets a job or is

2    offered a job at an employer that wants to hire the resident

3    to work graveyard shift.  Can that be done?

4        A.    Yes.

5        Q.    And so residents can literally sleep during the

6    day at Reynolds and check out at, say, 9 p.m., for example,

7    go to their job, and come back and check in at 6:30 a.m.?

8        A.    Yes.

9        Q.    Does Reynolds frequently have problems with

10   residents leaving to say they're going to a job and never

11   coming back?

12             MR. JOBSON:  I'm going to object to the form

13   of the question, only because of the word "frequently."

14        Q.    And if you want to sort of describe your answer or

15   qualify it, let me know.

16             MR. JOBSON:  You may answer if you understand

17   what he means.

18        A.    I do, and I would say no, not frequently, but it

19   does happen from time to time.

20        Q.    Okay.  What are the living conditions for the

21   residents there at Reynolds?  Do they have their own room,

22   or do they share a room?

23        A.    Most are single-man rooms, and there are a few

24   double-man rooms.

25        Q.    And that leads me to a question:  Is it all male

Page 28

1   residents?

2        A.    It is an all-male.

3        Q.    And do the rooms have their own bathroom

4   facilities, or are those shared?

5        A.    It is shared.

6        Q.    What about eating?  Does Reynolds have a

7   cafeteria?

8        A.    We have a kitchen and a dining area.

9        Q.    Are there regular meals that are provided to all

10  the residents at particular times of day, or can a resident

11  go in and get a hamburger whenever he feels hungry?

12       A.    They have regular meal times.  They have a

13  breakfast time, lunchtime and dinner time.  And for those

14  who work late at dinner time, we have what's called a late

15  plate system so they get a hot meal when they get in.

16       Q.    Do they have to pay for their meals at Reynolds?

17       A.    It's included in their room and board.

18       Q.    I see.  And how much is the room and board?

19       A.    13.50 a day.

20       Q.    So the 13.50 a day pays for three meals per day,

21  and it pays for their housing?

22       A.    Correct.

23       Q.    And it also pays for the access to the various

24  programs and services that you described?

25       A.    Correct.

Peralez vs. The Washington Department of Corrections  Xandis Phillips                November 8, 2007

Page 32

1      Q.   Do you know whether or not he received any

2  job-seeking assistance?

3      A.   I know that he did not, because he was releasing

4  to Skagit County.

5      Q.   Do you know how soon prior to his ERD Mr. Peralez

6  transferred to Reynolds?

7      A.   No, I couldn't honestly tell you.  But it wasn't

8  very long.

9      Q.   Does Reynolds have a library?

10     A.   Yes.

11     Q.   And residents can freely access the library?

12     A.   Yes.

13     Q.   Does Reynolds have pay telephones?

14     A.   Yes.

15     Q.   And residents can freely use those?

16     A.   Yes.

17     Q.   Does Reynolds have anything having to do with, you

18  know, recreation, I mean, pool tables or foosball tables or

19  dart boards or anything of that nature?

20     A.   We've got a ping pong table, pool table, and a

21  weight room.

22     Q.   Okay.  What if a resident wants to obtain

23  identification in the form of a -- if not a driver's

24  license, at least a Washington ID card?  Are they permitted

25  to do that?

Peralez vs. The Washington Department of Corrections    Xandis Phillips                    November 8, 2007

Page 33

1       A.    Some are; some are not.

2       Q.    What does it depend on?

3       A.    Depends on whether or not they have the finances

4    to do it.

5       Q.    In other words, actually pay for the ID card?

6       A.    Yeah.  They have to pay for their own ID card.

7    And it depends on where they're going to release to.

8    Sometimes they're -- and it depends on the timing.

9       Q.    Okay.  Are residents permitted to look for

10   permanent housing where they might live after they're

11   released from the DOC?

12      A.    Yes.

13      Q.    So they can actually do, essentially, an apartment

14   search?

15      A.    Yes.

16      Q.    Are residents allowed to visit public agencies to

17   apply for or learn about public assistance programs?

18      A.    No.  Well, I should take that back.  They can.  It

19   depends on their circumstances, again.  It depends if -- we

20   have senior citizens that are getting Social Security.  We

21   have people who may need --

22              THE COURT REPORTER:  Please slow down.

23      Q.    Slow down.

24      A.    I know.  Residents that need food stamps.  I said

25   one more thing.

Peralez vs. The Washington Department of Corrections    Xandis Phillips                November 8, 2007

Page 34

1        Q.    JSU or JCU.

2        A.    GAU benefits.

3        Q.    What are GAU benefits?

4        A.    They are, like, a supplemental income that you get

5    monthly for -- a lot for disabled people who can't work or

6    mentally ill or that type.

7        Q.    Is that a state or a federal program; do you know?

8        A.    State.   Through DSHS, I think.

9        Q.    Okay.   And where is the office that a person would

10   visit if they wanted to learn more about GAU benefits?

11       A.    Belltown.

12       Q.    Are residents, if they make arrangements with

13   Reynolds, able to visit the Belltown office to learn about

14   GAU benefits?

15       A.    Yes.

16       Q.    And similarly, they're allowed to visit agencies

17   to learn about Social Security benefits and food stamps?

18       A.    Yes.

19       Q.    Can they actually apply for those services?

20       A.    They cannot apply for them until they are actually

21   released from custody.

22       Q.    Okay.   But they can at least get forms and learn

23   about eligibility requirements and that sort of thing?

24       A.    Yes.

25       Q.    Are they permitted to establish a bank account?

Page 35

1      A.    No.

2      Q.    Are they permitted to visit banks in order to

3 obtain information about starting a bank account?

4      A.    No.

5      Q.    Why not?

6      A.    Because the law states they cannot have access to

7 one nor have one nor use one while they're in custody.

8      Q.    Okay.  Let's suppose a resident is working at a

9 job, and their paychecks are being deposited in the trust

10 account, but they need some cash to buy something having to

11 do with their job, for example, maybe some sort of piece of

12 clothing or equipment or a hard hat.  What can they do to

13 get cash?

14      A.    They can request money out of their inmate banking

15 via their CCO.  And if they have money in their account, it

16 will be approved, and they will get it within a couple

17 weeks.

18      Q.    And do they actually get cash?

19      A.    They get a check that they have to go cash.

20      Q.    Where can they cash the check?

21      A.    At a bank.

22      Q.    Okay.  So they can visit a bank to cash a check.

23      A.    Correct.

24      Q.    What if they're out and about and they're working

25 a long shift and they get hungry?  Can they stop at

Peralez vs. The Washington Department of Corrections    Xandis Phillips                    November 8, 2007

                                                                          Page 36

1    MacDonald's?

2         A.    No, not without prior approval.

3         Q.    What do they need to do to get approval to make

4    arrangements to visit a restaurant, let's say, in connection

5    with a lunch break?

6         A.    It will normally be denied.  They are not allowed

7    to.

8         Q.    Okay.  So what do they do for food?

9         A.    We provide them lunches that they take with them.

10        Q.    Oh, I see.  Box lunch?

11        A.    Sack lunch, yeah.  And if they're working

12   construction, they get two lunches.

13        Q.    Okay.

14              MR. JOBSON:  Starting to sound better to you,

15   huh?

16              MR. BUDGE:  Sounds like a great deal, I've

17   got to tell you.

18        A.    I don't think the guys get it until they get out,

19   though, and they figure out how much everything really does

20   cost.

21        Q.    Yeah.  Right.  Okay.

22              MR. JOBSON:  Sure beats Guantanamo.

23              MR. BUDGE:  Let's don't even go there.  You

24   don't want to get me talking.

25        Q.    If you know, what is a DT25 profile?  Does that

STARKOVICH REPORTING SERVICES
206.323.0919

35

d80c0500-e0b1-45e9-946a-c092a55c6fd3

Page 42

1    referrals that you check on a weekly basis, what information

2    is contained on the computer screen?  What are you initially

3    looking at?

4         A.   The screen initially says the guy's DOC number,

5    his name, and what custody level he is.  I'm just trying to

6    look at the screen real quickly, what his ERD or ARD is, and

7    when he was referred and where it came from.

8         Q.   Meaning which prison?

9         A.   Institution.  Correct.

10        Q.   And so you then divide that list between the three

11   of you.  And once you have assigned yourself one third of

12   the list, then what do you do in order to consider whether

13   or not a work release referral is going to be approved or

14   denied?

15        A.   I go in and look at the screen of the offender and

16   look to see if he's minimum custody first.  They have to be

17   minimum custody before we screen them.  I look at the county

18   they were convicted of -- out of, and now that's changed,

19   because now we have the 6157, where they have to go back to

20   their original county of conviction.  So it's a little bit

21   different now.

22             I look to see what their release plan is, do they

23   have one, do they not have one.  I look at their infractions

24   to see what kind of infractions they've had.  I'm trying to

25   think of what else.  I do it so by rote that I'm trying to

d80c0500-e0b1-45e9-946a-c092a55c6fd3

Peralez vs. The Washington Department of Corrections    Xandis Phillips                    November 8, 2007

Page 43

1    remember everything -- I look at the chrono screens, to see

2    if there's ever been any issues, and then I make my

3    decision.

4        Q.   Do you look at the PULHESDXT code scores?

5        A.   Yeah, I do.  Yes, I do.  And then if I see

6    something that looks -- that's not explained anywhere, I'll

7    do a note to the institution saying what is the issue, you

8    know, what -- you know, is he diabetic so he -- you know,

9    because P3 could be diabetes.  It could be asthma.

10           And then we negotiate, and then I approve or deny,

11   depending on what the issue is.  If medical says no, he

12   needs a major medical facility, then I have to deny him.  If

13   they don't say that, then we'll accept him.

14       Q.   Do you actually talk with medical about it?

15       A.   No.  We email.

16       Q.   Do you actually email with the offender's medical

17   provider?

18       A.   No.  I go to the counselor, who then goes to

19   medical, and then they send me back medical's response.

20       Q.   Okay.  Have there been any other individuals at

21   Reynolds since 2003 who have been responsible for reviewing

22   work release referrals?

23       A.   No.

24       Q.   When you look at information about an offender on

25   the computer in order to assist you in making a

Page 46

1        A.    -- in Olympia, who also has the headquarters

2     screening committee.  And then they review it and present it

3     to the headquarters screening committee, and then the

4     committee makes a decision.

5        Q.    Either to uphold your denial or overrule your

6     denial?

7        A.    Correct.

8        Q.    Now, you mentioned that when you fill out a work

9     release denial form, you state the reason for the denial on

10    the form.

11       A.    Correct.

12       Q.    Are you required to do that?

13       A.    Yes.

14       Q.    And is your practice to be accurate when you are

15    filling out the reason for the denial?  In other words, you

16    try to be accurate in terms of stating the reason for the

17    denial?

18       A.    Correct.

19       Q.    And do you completely state the reason for the

20    denial, if there's more than one reason?

21       A.    Yes.

22       Q.    Do you ever communicate with classification in

23    Olympia about the reason that you denied an offender?

24       A.    Sometimes they'll ask for clarification, yes.

25       Q.    Is it the general practice that after you fill out

PHILLIPS                                                                    127

# C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;

That I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand

and seal this  15th day of  November        2007.



PATRICIA A. BLEVINS
NOTARY PUBLIC in and for the
State of Washington, residing
at Federal Way.
My commission expires 10/15/08.

39

# DECLARATION OF EDWIN S. BUDGE

## EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| RICKEY PERALEZ, on behalf of himself and others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. C06-5625 JKA ) |
| THE WASHINGTON DEPARTMENT OF CORRECTIONS, HAROLD CLARKE, DOUGLAS WADDINGTON, BELINDA STEWART, KEVIN SHANAHAN, JEAN STEWART, and JANE DOES 1-20, employees and officials of the Washington Department of Corrections and/or Stafford Creek Corrections Center, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Deposition Upon Oral Examination

of

SANDRA MUSSELWHITE

Taken at 1019 Pacific Avenue
Tacoma, Washington

DATE:  November 14, 2007

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

STARKOVICH REPORTING SERVICES
(206)323-0919

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                          November 14, 2007

Page 5

1          TACOMA, WASHINGTON; WEDNESDAY, NOVEMBER 14, 2007

2                              1:10 P.M.

3                              --o0o--

4

5    SANDRA MUSSELWHITE,              deponent herein, having been

6                                     first duly sworn on oath, was

7                                     examined and testified as

8                                     follows:

9

10                   E X A M I N A T I O N

11   BY MR. BUDGE:

12        Q.    Would you state your name, please.

13        A.    Sandra Musselwhite.

14        Q.    And Ms. Musselwhite, do you work for department of

15   corrections?

16        A.    I do.

17        Q.    What is your title?

18        A.    Community corrections supervisor.

19        Q.    And where do you work?

20        A.    Currently I supervise Progress House and

21   Rap/Lincoln Work Release in Pierce County.

22        Q.    In terms of the chain of command at these work

23   release facilities, are you the highest person in the

24   hierarchy at those facilities?

25        A.    At the facility, yes.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                November 14, 2007

Page 6

1      Q.   And who do you report to?

2      A.   Steve Johnson.  He's field administrator for work

3   release.

4      Q.   I was just about to ask you whether he was the

5   field administrator for work release.  How long have you

6   been the head of Lincoln Park/Rap Work Release?

7      A.   Since 6/4/07.

8      Q.   And how long have you been the head of Progress

9   House Work Release?

10      A.   October '04.

11      Q.   Have you worked at any other work release

12   facilities besides the ones --

13      A.   Yes.  Bishop Lewis, in Seattle, Ratcliff, in

14   Seattle, R-a-t-c-l-i-f-f, and Kitsap Work Release, which has

15   morphed into Peninsula Work Release now, many years ago,

16   early '80s.

17      Q.   What were the positions that you held at these

18   other work release facilities, beginning with Bishop Lewis?

19      A.   I've been CCO in work release, and I've been a

20   supervisor.

21      Q.   Have you supervised Bishop Lewis?

22      A.   Yeah.

23      Q.   From when to when did you supervise Bishop Lewis?

24      A.   It was about five years, right before Progress

25   House.

Page 7

1      Q.    And approximately how long were you the supervisor

2  at Bishop Lewis?

3      A.    Five years.

4      Q.    I see.  So for the five-year period prior to going

5  to --

6      A.    Progress House.  So '90-something to 2004.   '99 to

7  2004.

8      Q.    One of the things that you'll see during this

9  deposition, it's not quite like a normal conversation in the

10  sense that I have to complete my answer and then you have to

11  give your question -- or --

12      A.    Right.  I got it.

13      Q.    You know the drill.  I'm tired, and it's only

14  1:16.

15          For what period of time were you the supervisor at

16  Ratcliff?

17      A.    Eight years, the eight years right before Bishop

18  Lewis.  So '91 to '99, I guess, somewhere in there.  I could

19  be off.

20      Q.    Sure.  These are --

21      A.    Estimates.

22      Q.    -- estimates.  And for what approximate period of

23  time do you think that you were the supervisor of Kitsap

24  Work Release?

25      A.    I actually went over there as a CCO3 and about six

deeb133f-8776-4136-9688-9144e6f793ab

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 8

1    months later became the supervisor for about two years.  And

2    it was in the mid-'80s.  I was also a CCO at Rap/Lincoln in

3    the '80s, as well.

4        Q.   At the current time where do you work, physically?

5    Do you have an office somewhere?

6        A.   I had two offices, one in each facility.

7        Q.   So you have one office at Progress House and

8    another office at --

9        A.   Ratcliff.

10       Q.   Try to do your best to wait for me to finish my

11   question.

12       A.   Okay.

13       Q.   Does Rap/Lincoln together have approximately 50

14   beds?

15       A.   Yes.

16       Q.   How many beds, approximately, does Progress House

17   have?

18       A.   75.

19       Q.   Do you know who Mark Stern is?

20       A.   Yes.

21       Q.   What is his position?

22       A.   He is the director of medical.  I can't remember

23   his exact title.

24       Q.   In recent months, did you attend a meeting where

25   Mark Stern was present?

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                November 14, 2007

Page 15

1    floor.  The male beds are on the second floor.  So it meant

2    stairs.  Then going out and looking for work.  So I would

3    assess that individually with the counselor.

4         Q.   Did you take fours at Progress House?

5         A.   No.

6         Q.   Did you take fours at Bishop Lewis?

7         A.   No.

8         Q.   Did you take threes at Bishop Lewis?

9         A.   Same way.  Same way.  I always assessed it with

10   the counselor.

11        Q.   Did you take fours at Ratcliff?

12        A.   No.

13        Q.   Did you take threes at Ratcliff?

14        A.   Same way.

15        Q.   And was that also the same way at Kitsap?

16        A.   You know, that was before PULHESDXT scores.  That

17   was before computers.

18        Q.   Right.  Right.  Let's assume that somebody had --

19   well, first of all, if we look at the PULHESDXT code

20   acronym, are you familiar with what the different letters

21   stand for?

22        A.   Yeah.

23        Q.   Okay.  So if somebody had a four, let's say, on

24   the "E" factor, would that person be allowed to come to

25   Progress House?

STARKOVICH REPORTING SERVICES
206.323.0919

deeb133f-8776-4136-9688-9144e6f793ab

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                November 14, 2007

Page 16

1      A.    No.

2            MR. JOBSON:   Object to the form of the

3   question.   It's vague as to time.

4      Q.    Well at any time that you've been supervisor?

5      A.    No.

6      Q.    And would a person with a four on the "H" factor

7   be allowed to come to Progress House?

8      A.    No fours.

9      Q.    Would a person with a four on the "E" or "H"

10  factors have been allowed to come to Bishop Lewis while you

11  were the supervisor?

12     A.    No.

13     Q.    Would a person with a four on the "H" or "E"

14  factors have been allowed to come to Ratcliff while you were

15  the supervisor?

16     A.    They wouldn't have been referred.

17     Q.    Why is that?

18     A.    Work release only accepted up to three.

19     Q.    Did you understand that to be a blanket rule

20  instituted by the DOC centrally?

21     A.    I don't know where it was instituted.   It's so

22  long ago.

23     Q.    Yeah.   I guess I'm trying to understand.   When you

24  say that they wouldn't have been referred, would that

25  have -- I mean what is your understanding based on?

Page 22

1    infractions, she'll look at infractions, she determines for

2    me what the crime of origin is and puts that -- writes that

3    on, and also tells me where they're -- who they're going to

4    release to, like parents or friends or whatever.  She checks

5    for warrants, misdemeanor warrants that are out there.

6    She'll check if they're a sex offender, if they received

7    treatment, what level they are, that kind of stuff.

8        Q.   And then --

9        A.   Anything that she wants me to take a look at,

10   she'll --

11       Q.   And then does she provide you with all of that

12   information, or does she just filter out what she thinks --

13       A.   No.  All of it comes to me in a packet.

14       Q.   Is there any information that you review that

15   includes the offender's PULHESDXT code scores?

16       A.   Yes.  That's on the DI14.

17       Q.   Excuse me for my ignorance.  Is the DI14 the same

18   as the legal face sheet or what I call the legal face sheet?

19       A.   Yeah, well, I would think so.  I don't -- do you

20   want to show me what you think the legal face sheet is, and

21   then I'll tell you whether that's the DI14?

22       Q.   Yeah.  (Counsel shows document.)

23       A.   Yeah, that's it.

24       Q.   Okay.  It bears Production Number 05172844

25   through 7.  So what I've been calling the legal face sheet

Page 46

1    A.    That's what this says.

2    Q.    Okay.  Do you have any reason to think that that

3  is not what occurred?

4    A.    Well, it says it got referred to Lincoln Park.  I

5  don't -- JSC.  I don't know who that is.  And then

6  eventually we accepted.  And I don't know why that happened.

7    Q.    That was just about four or five months ago.  Is

8  that --

9    A.    Yeah.

10   Q.    Do you have any recollection of this offender?

11   A.    I don't.

12   Q.    Do you know why this offender would have been

13 referred to Lincoln Park and then it came back to you at

14 Progress House?

15   A.    No.

16   Q.    For those offenders who are permitted to come to

17 Progress House and are actually transferred there, what

18 services does Progress House provide to the inmates relative

19 to finding employment?

20   A.    If they need help finding employment, they can go

21 down to Work Source, and they have a number of computers

22 there, and there's a woman there that will help them with

23 referrals.  She also sends us hot jobs that she gets to help

24 refer.  We do business with, you know, quite a few employers

25 in the Pierce County area.  So we refer there, and they

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                November 14, 2007

Page 47

1    hire.

2         Q.    What are some of the main employers that hire out

3    of Progress House?

4         A.    Oh, Tacoma Trust.

5         Q.    Did you say "Tacoma Trust"?

6         A.    Yeah.  And they also, I think, have hired some

7    Rap/Lincoln people.

8         Q.    What kind of business is Tacoma Trust?

9         A.    I don't know.  CCO work.

10        Q.    What?

11        A.    That's a CCO job.  We have just, you know, five or

12   six.  There's, like, auto repair places and pallet services.

13        Q.    Did you say "pallet"?

14        A.    Pallet services.

15        Q.    What are some of the other employers that --

16        A.    I'm sorry.  I can't remember right now.  We have a

17   list.

18        Q.    And when you talk about Work Source, is that a

19   service offered directly by Progress House, or is that a

20   different job assistance agency or something?

21        A.    It is.  It's with Employment Security.  But they

22   actually are housed in our CJC in Tacoma, which is on 28th

23   Street.

24        Q.    What does "CJC" mean?

25        A.    Community Justice Center.  It's got a couple

Peralez vs. The Washington Department of Corrections    Sandra Musselwhite                November 14, 2007

Page 48

1   units, field units.

2        Q.   Oh, okay.  So the residents of Progress House can

3   actually go to Work Source?

4        A.   Uh-huh.

5        Q.   Yes?

6        A.   Yes.

7        Q.   And just like any other member of the community,

8   access the resources there?

9        A.   Yes.

10       Q.   All right.  Do they need a special pass to go down

11  there?

12       A.   Yes.

13       Q.   Okay.  Does Progress House offer any sort of job

14  counseling, help with resumes or applications, access to

15  classified ads, or anything else that you can think of that

16  can assist offenders with finding a job?

17       A.   I take a newspaper for the offenders to use.

18  Again, the hot jobs that are sent to us by Work Source are

19  posted for them.  They can go down to Work Source and work

20  on resumes.  Frequently they bring resumes already made from

21  the institution, because they've had some programming in the

22  institution that prepares them for work release.

23       Q.   Can they go out and pound the pavement and put in

24  applications?

25       A.   Yes.

Peralez vs. The Washington Department of Corrections    Sandra Musselwhite                    November 14, 2007

Page 49

1     Q.    What do they need to do with the work release

2     facility in order to arrange a day trip to, you know, put in

3     applications up and down the street?

4     A.    Actually, they go out every day, and they have to

5     put in a pass with a plan.  So they have to tell us where

6     they're going to go and who they're going to see.  And they

7     go out, and then we check and make sure, randomly, that

8     that's what they did.  They have ten working days to find a

9     job when they first arrive, and that can be extended if

10    they're working hard at it.

11    Q.    Do most inmates get a job within ten days?

12    A.    Yes.

13    Q.    And when inmates get their paychecks, do they then

14    turn those over to the work release facility to be deposited

15    in their trust account?

16    A.    Yes.

17    Q.    And then does the work release facility

18    automatically deduct some amount for their room and board?

19    A.    The business office does that.

20    Q.    Do you know what that amount is for Progress

21    House?

22    A.    $13.50 a day.

23    Q.    And does that amount include both the room and

24    meals?

25    A.    Yes.

Page 50

1    Q.   All right.  Are residents permitted to work, once

2  they find a job, any shift, swing, graveyard, day shift?

3    A.   Yes, depending on the transportation issue.

4    Q.   But assuming they can find a reliable way to get

5  to and from a job, would there be any prohibition on an

6  inmate working from nine p.m. to five a.m.?

7    A.   No.

8    Q.   How do they get in and out of the facility?  Do

9  they have a special code or a card or something of that

10  nature?

11    A.   The facility -- Progress House has been unlocked

12  till recently.  We just have a buzzer now and keep the doors

13  locked at night.  They sign in and out.

14    Q.   And is it staffed 24 hours a day?

15    A.   Yes.

16    Q.   So if somebody comes home from a job at four or

17  five a.m. and pushes the buzzer, there's somebody working

18  that can open it?

19    A.   Yes.

20    Q.   What about basic necessities like laundry and

21  things like that?  What is provided by Progress House and/or

22  Progress House's contractor, if there is one, and what does

23  the -- what do the residents have to provide for themselves?

24    A.   There's laundry services there.  They have to pay

25  for it.  When they arrive, they're given several checks.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                 November 14, 2007

Page 51

1   One is made out to, you know, the bus company so they can

2   get a bus pass or bus tickets, and another one is a draw for

3   them.   Another one is so they can get their ID.

4           So they have a number of checks that they get, and

5   then two weeks later they get another group of checks.   So

6   we front them that as kind of like a loan, and that comes

7   from the State.   And they can have up to $300, but they

8   normally only get $150, and to get anything beyond that,

9   they have to have my approval.

10      Q.   To get anything beyond 150?

11      A.   150.   So I can approve up to 300 for them.   They

12  have to pay that back.

13      Q.   And is that a 150 draw when they first arrive and

14  then another 150 draw two weeks later?

15      A.   No.   The 150 is the total for that period of time.

16  I think they get, like, $50 two weeks later.

17      Q.   Okay.   And they use that money for what, buying

18  bus passes, you said?

19      A.   A bus pass, Social Security card, ID, and hygiene

20  items, if they need it.

21      Q.   So do they actually go and cash those checks?

22      A.   Yes.

23      Q.   I see.   So forgive me for being so ignorant about

24  this.   Is the $150 -- are those in the form of checks that

25  are made out to the resident or to --

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 52

1        A.    Some of them are, and some of them are made out to

2    the place where they're going to get the item, like Social

3    Security and/or the State ID, you know.  We like to limit

4    how much money they have.

5        Q.    Right.  But if an offender wishes to buy some

6    personal hygiene items, for example, that's going to be by

7    way of a cash purchase, and so they'll get a check, and then

8    they go cash it at the bank?

9        A.    Yes.  And we also have some hygiene items there

10   for them, too, if they need it.

11       Q.    All right.  What about blankets and towels and

12   things of that nature?  Are those provided by the work

13   release facility?

14       A.    The contractor, yes.

15       Q.    And the offenders that find employment in the

16   community, do they earn market wages comparable to what, you

17   know, other people earn?  In other words, it's at least

18   minimum wage?  Is that your understanding?

19       A.    Yes.

20       Q.    Does Progress House have any drug or alcohol

21   programs available to offenders?

22       A.    Yes.

23       Q.    Does it have any type of anger management or other

24   type of counseling services available?

25       A.    Sometimes.  My CCOs actually have been trained to

deeb133f-8776-4136-9688-9144e6f793ab

Page 53

1    teach anger management, and there is anger management taught

2    around the area by other CCOs.  So they can be referred to

3    other programs.  So that's kind of how we deal with that.  I

4    have videos, you know, so they could watch videos about it,

5    that are kind of mini classes.

6         Q.    Does Progress House have a library of some sort?

7         A.    They have a big bookcase full of books.

8         Q.    Are there any recreational opportunities in the

9    way of, you know, pool tables or dart boards or things like

10   that?

11        A.    They have pool tables, and they are allowed social

12   outings in Step Two so they can go out with their family.

13        Q.    And what has to occur in order to have a social

14   outing?

15        A.    Their family applies and has to pass a record

16   check and go through a sponsor orientation.

17        Q.    And assuming they pass the record check and

18   complete the sponsor orientation, can they simply come and

19   pick up the resident and go out and have dinner out or go to

20   a movie or something like that?

21        A.    Yes, for a limited amount of hours per week.

22        Q.    How many hours per week?

23        A.    Let's see.  Step Two is 20, and Step Three is 30,

24   I believe, and it has to be within certain time frames of

25   the day.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 54

1      Q.    Can loved ones come and visit the residents at the
2    facility?
3      A.    Yes.
4      Q.    Is there a room set up to make that happen?
5      A.    Yes.
6      Q.    What are the visiting hours?
7      A.    I think at Progress House the only days they're
8    not allowed to have visits are the days we do our major
9    cleanup.  And there's two days, and I think it's Tuesday and
10   Thursday that they have to clean the facility.  It has to be
11   spotless.
12     Q.    Are there opportunities to actually work at
13   Progress House?
14     A.    No.
15     Q.    What about the kitchen?  Does the kitchen provide
16   three meals a day to offenders?
17     A.    Yes.  Weekends, we do a brunch, kind of a bigger
18   meal that's -- you know, so they can sleep late and then
19   have a brunch.  So I think weekends are two meals, but
20   they're bigger.
21     Q.    And if there's an inmate who finds a job -- well,
22   for those inmates who find jobs, what do they do about
23   eating at their place of employment or on their way to or
24   from their place of employment?
25     A.    Well, we don't allow that.  They're given a lunch,

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                              November 14, 2007

Page 55

1    a sack lunch, and if they get back after dinner, we hold a

2    late plate for them.  If they work at Burger King, and they

3    can eat there, usually, as well, we don't limit their meal

4    because they're eating at work.

5         Q.   Okay.  That's punishment enough, eating at Burger

6    King.  Rather be back in prison.

7         A.   You might not really believe that.

8         Q.   What about offenders -- or residents, rather --

9    who need to see a doctor?  Does Progress House have methods

10   in place to let that happen?

11        A.   Yes.  Well, there's some community clinics that do

12   kind of sliding scale pay.  So if it's during the work week,

13   we might arrange for them to go to one of those.  After

14   hours, they have to go to the hospital if it's that serious.

15        Q.   Are there residents who have a need for regular

16   medical appointments with certain health care providers?

17        A.   Sometimes.

18        Q.   So what happens in those instances?

19        A.   They're allowed to go.  They have to pay their own

20   medical in work release, you know.  So that's a problem.

21        Q.   Do any of the residents get medical insurance as

22   part of their job?

23        A.   Sometimes.  But usually you have to work, you

24   know, a period of time before you get that.

25        Q.   And for those residents who have need for regular

STARKOVICH REPORTING SERVICES
206.323.0919

58

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 56

1   medical appointments, does your facility have any problem in

2   allowing them to go so long as they, you know, make

3   appropriate arrangements?

4        A.   Right.  No.

5        Q.   Is that something that regularly occurs?

6        A.   Yes.

7        Q.   What about inmate medications?  How is that issue

8   handled at Progress House?

9        A.   If it's prescribed, the staff -- it's locked up.

10  We have medication times.  Offender comes down for his

11  medication.  We supply him with the bottle of medication.

12  He pours out what he needs to take.  The staff watch.  He

13  takes it, and we lock it back up.  Anything other than

14  prescribed they get to keep on them.

15       Q.   And how often is the med line?

16       A.   I don't know.  Probably four times a day, maybe.

17       Q.   Who issues the medications?

18       A.   The lead program monitor or lead facility monitor

19  at Progress House.  They're the only ones allowed to have a

20  key.

21       Q.   Okay.  So is it your understanding that they're

22  allowed to do that even if they're not a nurse?

23       A.   Well, they're not dispensing.

24       Q.   Right.

25       A.   They're handing the offender his meds.  The

Page 57

1   offender takes what he needs.

2       Q.   Right.   Does the program manager ever put the

3   medication into a -- you know, one of those little plastic

4   boxes that has the different days of the week marked on it?

5       A.   No.   We don't do anything like that.   We don't

6   touch their meds except to hand them the bottles.

7       Q.   Are there many inmates that have a need for

8   regular medications?

9       A.   Prescribed?   It's a lot less than it was when we

10  had to monitor the over-the-counter too.   It's quite a

11  change in work load since they took that away.   So I

12  think -- you know, it probably changes on any given day, but

13  maybe 10 of them, out of 75.   That's about all.

14      Q.   Okay.   And what do the residents do in order to

15  get their prescriptions refilled?

16      A.   They usually call me at midnight to tell me that

17  the medication needs to be renewed.   It's really their

18  responsibility.

19      Q.   Well, can they go to a pharmacy and present a

20  prescription and pay for the drugs and bring them back?

21      A.   They have to do all of that, yeah.

22      Q.   But are they permitted to do so under whatever

23  rules govern Progress House?

24      A.   Yes.   Sometimes they have their families do that

25  for them.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 58

1     Q.   Do families ever participate in residents making

2   medical appointments?

3     A.   Yes.

4     Q.   Can family members assist with transportation to

5   medical appointments?

6     A.   Yes.  That is up to the CCO.

7     Q.   Now, I think you already said this, and I didn't

8   let it register in my brain.  Does Progress House have both

9   male and female residents?

10    A.   Yes.  Six female.

11    Q.   I see.  And how is Progress House laid out

12  physically?

13    A.   It's a nice, big facility, having come from Bishop

14  Lewis, which is real tight, you know.  The male beds are all

15  upstairs, and they have three bathrooms up there, and then

16  the female beds are all downstairs.

17    Q.   Okay.  So --

18    A.   And all the administrative office, the dining

19  room, the day rooms, everything, is downstairs.

20    Q.   So the female beds are on the same floor with the

21  dining facilities and the administrative offices?

22    A.   Yes.

23    Q.   And are there 75 minus 6 -- something like 59 male

24  beds?

25    A.   69 male beds.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                      November 14, 2007

Page 59

1      Q.    Right.  And are all of those beds on the second

2   floor?

3      A.    All of them.

4      Q.    So how many bathrooms are there?

5      A.    There's three, you know, two rather large ones and

6   then a smaller one on the third floor.

7      Q.    Okay.  Does each bathroom have a number of showers

8   and a number of toilets?

9      A.    The two do.  They're big.

10     Q.    Okay.  And in terms of the rooms where the men

11  stay, are they shared?  Single?  Quadruple?  How does it

12  work?

13     A.    We have all different kinds.  So there's -- some

14  rooms have four beds.  Some rooms have two beds.

15     Q.    In terms of what you described concerning

16  financial assistance, or, I should say, in terms of the

17  draws that you described, is that significantly different at

18  Progress House from the way it worked at Bishop Lewis?

19     A.    No.

20     Q.    It's basically the same?

21     A.    Yes.

22     Q.    And in terms of social outings and visits by

23  family members, is that basically the same?

24     A.    Basically the same, yeah.

25     Q.    And in terms of the process by which residents go

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 60

1    about finding employment, is that basically the same?

2         A.   Yeah.   We didn't have Work Source in Seattle.

3         Q.   Are there any other significant distinctions,

4    other than that?

5         A.   No.

6              MR. BUDGE:   I would suggest we take a short

7    break so that we can have a little bit of water and use the

8    facilities as appropriate.   Is that okay with you?

9              THE WITNESS:   Yeah.   That's fine.

10                        (Break in the proceedings.)

11        Q.   Has Progress House had any residents in

12   wheelchairs in the period of time that you've been in

13   charge?

14        A.   No.

15        Q.   I think you mentioned that there was an elevator

16   at Progress House; is that correct?

17        A.   Yeah, like a service elevator.

18        Q.   Is there a way to enter the facility without

19   walking up stairs?

20        A.   Yes.

21        Q.   Can you please describe that to me?

22        A.   It's a ramp.

23        Q.   Is there any reason that you can think of that the

24   facility would not be generally accessible to a

25   wheelchair-bound resident?

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite          November 14, 2007

Page 88

1    where Bishop Lewis didn't take people with threes or above?

2         A.    Yeah.

3         Q.    And did that, then, change at some point, where

4    Bishop Lewis began operating differently?

5         A.    Well, not -- I mean Bishop Lewis and everyone

6    else.  About the time -- and again, I mean, I don't have

7    great recall about when all these things happened.  But

8    about the time we computerized the referral packet, I think

9    there was an emphasis on us making sure that we maybe called

10   the counselors and discussed the three codes.  And I don't

11   know if that was two years ago or four years ago.  I just

12   don't know.

13        Q.    What was the practice before?

14        A.    Three or above was not work release.

15        Q.    Was there a blanket prohibition on the three or

16   more coming to work release?

17        A.    Pretty much.

18        Q.    And what is your best recollection about how that

19   happened?  In other words, was the counselor then not

20   supposed to forward a work release referral if the person

21   had a three or more, or what?

22        A.    We got them.  And this is an example of us not

23   accepting one.

24        Q.    Okay.  So did it matter where the -- at what

25   portion of the PULHESDXT code score the three or more

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                November 14, 2007

Page 90

1    language on the first page of Exhibit 59 --

2         A.    Yeah.   That time frame, I guess, we were doing

3    business that way.   I don't have any real recall of it.

4         Q.    Okay.   Regardless of what the exact time frame is,

5    and I recognize that that's not capable of being, what,

6    determined right here as we sit, did you have an

7    understanding about whether or not this policy of denying

8    work release to those offenders with a three or more was

9    applied statewide to all the work release facilities, or if

10   it was just some work release facilities?

11        A.    Since HCSC agreed, then -- you know, they're the

12   big, overall headquarters screening committee.   So they

13   wouldn't have agreed unless it was the way you do business

14   all over the state.

15        Q.    Do you know who was in charge of the

16   classifications section back in February of '04?

17        A.    Thatcher.

18        Q.    Do you know what his or her first name was?

19        A.    Jim.   James.

20        Q.    Have you ever attended any types of conferences or

21   gatherings of other professionals in the corrections

22   profession in other states?

23        A.    Yes.

24        Q.    Do you belong to any types of professional

25   associations or groups of people who have occupations in

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                        November 14, 2007

Page 96

1   directly?

2       A.   No.

3       Q.   Would it have been requested either from the

4   offender's counselor or medical?

5       A.   Yes.

6       Q.   So what ended up happening to the offender, in

7   terms of work release, that is?

8       A.   (Witness peruses documents.)  I don't know.  I

9   don't see what happened to him.

10      Q.   Well, did he ever get to go to work release?

11      A.   Let me look at this again.

12      Q.   Sure.

13      A.   We're talking 2/16/07.  (Witness peruses

14  documents.)

15      Q.   Ms. Musselwhite, if you don't know, we can just go

16  on to the next exhibit.

17      A.   Yeah.  I don't see what happened to him.

18      Q.   Okay.  When you look at an individual's PULHESDXT

19  code score, is it the case that you cannot tell what the

20  offender's actual condition is?

21      A.   Yes.

22      Q.   And is it the case that you cannot tell how or

23  whether the offender can be accommodated in his or her

24  activities?

25      A.   Yes.

Peralez vs. The Washington Department of Corrections   Sandra Musselwhite                    November 14, 2007

Page 101

1    conditionally accepting for Lincoln Park.  The offender had

2    to agree to participate in the TC program, which is the

3    therapeutic community.  It's part of a chemical dependency

4    program.  So they were doing a little of that.

5         Q.   And is that still the case, that there is this

6    conditional acceptance where the --

7         A.   I've tried to get them away from it, because, you

8    know, it's not necessary to do that.

9         Q.   Why do you consider it to be unnecessary?

10        A.   Once an offender arrives in work release, he has

11   or she has to participate in the program that we develop

12   with them, and it should be developed with the offender so

13   they have a say in that program.  And so if they don't want

14   to do the program, then they probably wouldn't stay there.

15        Q.   Okay.  Back when there was -- let me just -- is it

16   fair to say that there was, at some point in time in the

17   past, a blanket prohibition on accepting an offender with

18   three or more on PULHESDXT, excluding dental?

19        A.   I don't recall if it's in writing, but I think

20   that that's the case.

21        Q.   All right.

22        A.   And I don't know how long ago it was.

23        Q.   Okay.  Regardless of whether or not that was in

24   writing, during the period of time that that practice was in

25   place, did you sometimes get referrals of offenders whose

deeb133f-8776-4136-9688-9144e6f793ab

MUSSELWHITE                                                            117

# C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )


        I, the undersigned officer of the Court, under my
commission as a Notary Public in and for the State of
Washington, hereby certify that the foregoing deposition
upon oral examination of the witness named herein was taken
stenographically before me and thereafter transcribed under
my direction;

        That the witness before examination was first duly
sworn by me to testify truthfully; that the transcript of
the deposition is a full, true and correct transcript of the
testimony, including questions and answers and all
objections, motions, and exceptions of counsel made and
taken at the time of the foregoing examination;

        That I am neither attorney for nor a relative or
employee of any of the parties to the action; further, that
I am not a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially interested
in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand

and seal this 19th day of   November        2007.




                         PATRICIA A. BLEVINS
                         NOTARY PUBLIC in and for the
                         State of Washington, residing
                         at Federal Way.
                         My commission expires 10/15/08.